

**SIGNED this 24th day of March, 2026**

Rachel Ralston Mancl
**UNITED STATES BANKRUPTCY JUDGE**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF TENNESSEE

In re

PEGGY C. MANIS,

        Debtor.

No. 2:21-bk-51306-RRM
Chapter 13

### M E M O R A N D U M

APPEARANCES:

| | | |
|---|---|---|
| Steven C. Frazier, Esq. | Kimberly Cambron, Esq. | Debra L. Miller, Esq. |
| Post Office Box 1412 | 13010 Morris Road, Ste 450 | Post Office Box 59030 |
| Kingsport, TN 37662 | Alpharetta, GA 30004 | Knoxville, TN 37950 |
| *Attorney for Debtor* | *Attorney for Mortgage Assets Management, LLC* | *Chapter 13 Trustee* |

**Rachel Ralston Mancl, United States Bankruptcy Judge.**   The central question before the court is whether—prior to the recent amendment to Federal Rule of Bankruptcy Procedure 3002.1—a claim holder was required to comply with Rule 3002.1's notice requirements when its claim was secured by a reverse mortgage on the debtor's principal residence and treated under Part 3.1 of the court's form plan.   The answer is yes.   Both Rule 3002.1's history and its current language support the conclusion that its notice requirements apply to the holder of a claim secured by a reverse mortgage on the debtor's principal residence, and Part 3.1 of the court's form plan

mandates the same conclusion.   The claim holder was obligated to timely file and serve notices itemizing all fees, expenses, and charges incurred during the debtor's Chapter 13 bankruptcy that the claim holder sought to recover against the debtor's principal residence.   Because the claim holder failed to comply with Rule 3002.1, the court will prohibit the claim holder and its successors, transferees, and other assigns from ever using the nonpayment of any of those fees, expenses, or charges as a basis for declaring a default to foreclose on the debtor's residence.

I. <u>The Factual and Procedural Background</u>

Debtor Peggy Manis filed the petition commencing this Chapter 13 case on December 7, 2021.   In Part 3.1 of the debtor's proposed plan, she listed a claim of PHH Mortgage secured by her principal residence with an arrearage of $4,108.75 to be cured by monthly payments of $75 from the Chapter 13 trustee.   Attorney Holly Knight filed an objection to the plan on behalf of Cascade Funding Mortgage Trust HB5.   The objection was resolved by an agreed modification of plan signed by Ms. Knight, the debtor's attorney, and the Chapter 13 trustee.   The modification corrected the amount of the arrearage to $4,138.75, replaced the name "PHH Mortgage" with "Cascade Funding Mortgage Trust HB5 serviced by PHH Mortgage," and increased the amount of the monthly payment to $120 to cure the arrearage over the life of the 36-month plan.   Debtor's plan as modified was confirmed by an order entered February 23, 2022.

"PHH Mortgage Services" filed a proof of claim on behalf of Cascade in the amount of $134,392.32 on February 15, 2022, listing $4,138.75 as being the "[a]mount necessary to cure any default as of the date of the petition" (the "Arrearage").   The amount of the Arrearage listed in the proof of claim matches that listed in the agreed plan modification.   Attached to the proof of claim is an "Adjustable Rate Note (Home Equity Conversion)" and an "Adjustable Rate Home Equity Conversion Deed of Trust," each carrying the legend: "This is a Home Equity Conversion Mortgage Loan pursuant to Tennessee Code Annotated, Title 47, Chapter 30."   Both documents also refer to a "Home Equity Conversion Loan Agreement" that was not attached to the proof of claim.   The shorthand parentheticals used in the documents for the "Note," the "Security Instrument," and the "Loan Agreement," respectively, will also be used in this opinion.

Collectively, the documents are referred to as the "Reverse Mortgage."[1]

The Note and Security Instrument evidence that on June 22, 2007, the debtor conveyed her residence at 429 Easley Drive in Kingsport, Tennessee, in trust to secure a loan in a principal amount of up to $225,000 due and payable on February 2, 2095. No monthly loan payments are made under the Reverse Mortgage, but the debtor is required to pay annual property taxes and hazard insurance premiums for the residence during the term of the loan. Assignments attached to the proof of claim show the Reverse Mortgage was transferred to three other entities before it was acquired by Cascade on February 3, 2022. Three reports prepared by PHH Mortgage Services as of the date of the bankruptcy filing on December 7, 2021, were also attached to the proof of claim.[2] The reports are titled "Internal Payoff Statement," "Loan Balance History," and "Total Amount Due for Reinstatement." The Internal Payoff Statement provides a breakdown of the claim in categories for Principal Advances, Corporate Advances, Interest, Mortgage Insurance Premiums, and Servicing Fees. Each category is itemized in the Loan Balance History. The Total Amount Due for Reinstatement, reproduced in the appendix in Table 1, is the Arrearage which is comprised of a Property Charges Balance of $3,710.03 and Hazard Insurance of $478.72. No objection was made to the proof of claim, and the trustee commenced paying the Arrearage on March 15, 2022. The Arrearage payments of $120 per month were the only amounts listed as payable to the holder of the Reverse Mortgage under the debtor's Chapter 13 plan.

---

[1] A Home Equity Conversion Mortgage is one insured by the Federal Housing Administration under the U.S. Department of Housing and Urban Development. Tennessee's "Home Equity Conversion Mortgage Act" precludes lenders from issuing "a reverse mortgage loan contract unless it complies with all requirements for participation in HUD's Home Equity Conversion Mortgage Program … and is insured by the federal housing administration …." Tenn. Code Ann. § 47-30-104.

[2] In its reports PHH Mortgage Services uses the terms Principal Advances, Corporate Advances, and Property Charges Balance interchangeably with Principal Amount, Corporate Advance Amount, and Prior Servicer Property Charges, respectively. For consistency in the text of this opinion the court uses only the terms Principal Advances, Corporate Advances, and Property Charges Balance.

3

On February 10, 2024, attorney Shellie Labell with the law firm of Robertson, Anschutz, Schneid, Crane & Partners, PLLC, filed a notice of appearance and request for notices on behalf of Mortgage Assets Management, LLC. Notwithstanding the notice of appearance, it did not become apparent that Mortgage Assets had acquired the Reverse Mortgage from Cascade until July 8, 2024, when attorney James David Nave with the Robertson firm filed a motion for relief from the automatic stay on behalf of Mortgage Assets. An assignment attached to the motion indicates that Cascade transferred the Reverse Mortgage to Mortgage Assets two months earlier on May 8, 2024. The motion sought relief to foreclose on the debtor's residence on the grounds that she had failed "to pay hazard insurance and property taxes in the amount of $8,849.75." The debtor responded that she was current with all her plan payments and asserted that the motion had been filed by Mortgage Assets to circumvent the requirements of Rule 3002.1. The debtor noted that while Rule 3002.1 requires a claim holder to file a notice itemizing all fees, expenses, and charges incurred after a case is filed that the holder asserts are recoverable against a debtor or the debtor's principal residence, none were filed at any point during the pendency of her bankruptcy case.

The hearing on the motion for relief from stay was first set for August 13, 2024, then continued by an agreed order to September 10, 2024, and then continued again by announcements on four other occasions until January 7, 2025, when the Chapter 13 trustee informed the court that the motion was resolved. Neither the debtor's attorney nor Mortgage Assets' attorney appeared that day. The trustee announced that the parties had agreed that expenditures for force-placed insurance of $8,311 had been incurred, which charges the debtor would repay by extending her 36-month plan to 60 months.[3] The trustee stated that the agreed order so providing "is written and is at the creditor now to be approved," and would be submitted within 14 days. After 14 days passed, the clerk of court asked both Mr. Nave and the debtor's attorney to tender the agreed order.

---

[3] The trustee also informed the court that the claim holder's assertion in its motion for relief that the debtor had failed to pay property taxes was "incorrect." As explained later in this opinion, not only was the claim holder's assertion that the debtor had failed to pay property taxes incorrect, but the amount the claim holder insisted was a postpetition default was also incorrect. The $8,849.75 figure Mortgage Assets provided in its motion for relief from stay improperly included the balance of the prepetition Arrearage that was being cured by the debtor under her plan.

Neither attorney tendered an order.  On February 10, 2025, the court entered an order denying Mortgage Assets' motion for relief.  Mr. Nave left the Robertson firm and attorneys Layne Gillespie and Kimberly Cambron, also from the Robertson firm, were substituted as attorneys for Mortgage Assets.  Although the term of the debtor's plan was never extended from 36 months to 60 months to pay the charges for force-placed insurance as contemplated by the parties' agreement, Mortgage Assets took no further action regarding the matter raised in its motion for relief from stay.

During the interval between the filing and denial of the motion for relief, the Chapter 13 trustee made the final payment to cure the Arrearage and the debtor completed her 36-month Chapter 13 plan.  Accordingly, on February 25, 2025, the Chapter 13 trustee filed a Notice of Final Cure Payment pursuant to Rule 3002.1(f) directing the claim holder to file a response.[4]  On March 11, 2025, attorney Shellie Labell with the Robertson firm filed a Rule 3002.1(g) response disagreeing that the Reverse Mortgage was current.  Instead, Mortgage Assets asserted that a postpetition arrearage for force-placed insurance expenditures in the amount of $8,569 was owing as set forth in an attached report titled Total Amount Due for Reinstatement as of May 5, 2025, that is reproduced in Table 2 in the appendix.

On April 18, 2025, the debtor filed a motion pursuant to Rule 3002.1(h) stating that while the claim holder asserts "non-payment of obligations or post-petition mortgage fees, expenses, and charges that occurred or arose during the term of the plan," the "Claimant has not filed any notice of post-petition mortgage fees, expenses, and charges" as required by Rule 3002.1(c).  Ms. Cambron filed a response on behalf of Mortgage Assets stating that it was "not required to file [Rule 3002.1(c)] notices because the confirmed plan did not provide for maintenance of

---

[4] Before responding to the trustee's notice, attorney Shellie Labell filed an official notice that the claim had been transferred to Mortgage Assets with PHH Mortgage Corporation as servicer during the pendency of the bankruptcy case.  Despite the repeated transfer of the mortgage, the mortgage servicer never changed throughout the debtor's bankruptcy.  PHH Mortgage Services and PHH Mortgage Corporation are one and the same, PHH Mortgage Services being an assumed name of PHH Mortgage Corporation registered with the Tennessee Secretary of State.

contractual installment payments either by Trustee conduit or direct pay" and therefore Rule 3002.1(c) was not applicable.

The preliminary hearing on the debtor's Rule 3002.1(h) motion was set for June 3, 2025, and then adjourned to June 24, 2025, at which time the court set a final hearing. In accordance with Fed. R. Bankr. P. 9014(e) the scheduling order entered June 25, 2025, informed the parties that: "[a] final evidentiary hearing on this contested matter will be held on July 30, 2025," and "[t]he burden will be on the creditor to prove the validity and reasonableness of all the postpetition fees, expenses, charges, escrow, and costs claimed in its response to notice of final cure." The order also directed the filing of a joint statement setting forth the factual and legal issues to be decided by the court. The joint statement signed by the debtor's attorney and Ms. Cambron and filed on July 16, 2025, set forth three issues:

> The court must determine if Bankruptcy Rule 3002.1 applies to Creditor's claim in this case because the loan is a reverse mortgage.

> If Creditor's claim is subject to Bankruptcy Rule 3002.1, the court must determine what the penalty is for not complying with the rule.

> If Creditor's claim is not subject to Bankruptcy Rule 3002.1, the court must determine the amount owed by Debtor to Creditor.

An agreed order was entered July 25, 2025, resetting the evidentiary hearing for August 28, 2025. On that date the debtor's attorney, the Chapter 13 trustee, and Ms. Cambron on behalf of Mortgage Assets appeared for the hearing. Surprisingly, none of the attorneys chose to present any evidence of any kind—testimonial, documentary, or otherwise. Instead, the attorneys presented arguments, focusing primarily on one question of law: whether Mortgage Assets was required to comply with Rule 3002.1. Mortgage Assets argued that compliance with the rule was not required for reverse mortgages. The debtor and trustee took the opposite stance.

Despite the lack of any documents being presented though a witness at the hearing, the court will consider certain documents identified by the attorneys. Included in the parties' joint statement at paragraph no. 3 is the stipulation that "Creditor holds a claim [See Court Claim Register, Claim # 7-1] …. True and accurate copies of the Note, Deed of Trust and other documents establishing Movant's perfected security interest … are attached hereto as Exhibit 'A' and are

6

incorporated herein by reference." No such exhibit was attached but because it appears the parties intended to submit the proof of claim with all attachments for consideration, the documents are deemed stipulated. Because the Chapter 13 trustee attached to her brief an Internal Payoff Statement and Loan Balance History dated March 4, 2025, the court asked her about the source of the reports. The trustee answered that the documents were prepared by PHH Mortgage Services and furnished to her by Mr. Nave shortly before he left the Robertson firm. Ms. Cambron did not dispute that Mr. Nave had provided the reports to the trustee or their authenticity. Ms. Cambron attached documents pertaining to the purchases of the force-placed insurance to her brief. Because those attachments to the briefs and that attached to Mortgage Assets' Rule 3002.1(g) response were referenced by the attorneys in their arguments and are essential in deciding this contested matter, those documents are also deemed stipulated.

## II. The Chapter 13 Plan Mandated Compliance with Rule 3002.1.

The holder of the claim was required to comply with Rule 3002.1 because payment of the claim was provided for under Part 3.1 of the debtor's Chapter 13 plan. This conclusion is mandated by the language in the debtor's Chapter 13 plan and is supported by the historical application of Rule 3002.1 in this district as well as the amendment to Rule 3002.1 on December 1, 2025. The debtor, claim holder, and Chapter 13 trustee could have agreed that Rule 3002.1 would not be applicable to the Reverse Mortgage by placing a provision excluding its application in Part 8.1 of the court's form plan for Nonstandard Provisions. But no such exception was made.

The debtor's Chapter 13 plan follows the court's form (designated as Local Form 3015.1), the use of which is mandated by E.D. Tenn. LBR 3015-1(a). Part 3 of the court's form plan governs the treatment of secured claims, and Part 3.1 specifically governs secured claims that are being treated in accordance with § 1322(b)(5) of the Bankruptcy Code. Section 1322(b)(5) permits a Chapter 13 plan to "provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due." In other words, § 1322(b)(5) allows a debtor to cure a default and maintain payments on a debt that extends beyond the term of the debtor's Chapter 13 plan. If a debtor answers "yes" concerning whether the debtor's principal residence is the collateral securing a claim that is treated in Part 3.1,

7

then the form plan states in pertinent part that "[a]ny postpetition … fees, expenses, and charges noticed in conformity with Federal Rule of Bankruptcy Procedure 3002.1 will be paid .…"

Part 3.1 of the debtor's Chapter 13 plan—which includes the treatment of the Reverse Mortgage—is reproduced here:

### Part 3:  Treatment of Secured Claims

**3.1  Maintenance of Payments and Cure of Default, If Any** (*Complete if applicable.*)

Installment payments on the secured claims listed in this section, which will extend beyond the life of the plan, will be maintained during the plan, with payments disbursed by the trustee unless "Yes" is listed under "Direct Pay by Debtor(s)?" The holders of the secured claims will retain their liens following the completion of payments under the plan, and any unpaid balance of the claims is not subject to discharge.  Any existing arrearage on a listed claim will be paid in full through disbursements by the trustee, with interest, if any, at the rate stated.  Any postpetition installment payment changes and fees, expenses, and charges noticed in conformity with Federal Rule of Bankruptcy Procedure 3002.1 will be paid without plan modification by the party designated below to make the installment payment unless otherwise ordered by the court.

The installment payment and amount of arrearage stated in an allowed claim, proof of which is filed, control over any contrary amounts listed below.

If relief from the automatic stay is ordered as to any collateral described below, all payments under this section to creditors secured solely by that collateral will cease unless otherwise ordered by the court.

| Name of Creditor | Collateral Description | Principal Residence? | Installment Payment | Direct Pay by Debtor(s)? | Amount of Arrearage | Int. Rate on Arrearage | Arrearage Payment |
|---|---|---|---|---|---|---|---|
| Cascade Funding Mortgage Trust HB5 serviced by PHH Mortgage | 429 Easley Dr | Y | $0.00 | N | $4,138.45 | 0% | $120.00 |

The version of Rule 3002.1(a) that was in effect when the debtor's plan was confirmed and at the time of the hearing states that "[t]his rule applies in a Chapter 13 case to a claim that is secured by a security interest in the debtor's principal residence and for which the plan provides for the trustee or debtor to make contractual installment payments."[5]   If Rule 3002.1 applies, then subsection (c) of Rule 3002.1 requires the claim holder to timely file and serve "a notice itemizing all fees, expenses, and charges incurred after the case was filed that the holder asserts are

---

[5] Rule 3002.1(a) was amended effective December 1, 2025, and now states: "This rule applies in a Chapter 13 case to a claim that is secured by a security interest in the debtor's principal residence and for which the plan provides for the trustee or debtor to make *payment on the debt*." (Emphasis supplied.)

recoverable against the debtor or the debtor's principal residence." To be timely, subsection (c) states that the notice must be filed "[w]ithin 180 days after the fees, expenses, or charges are incurred."

The court's form plan makes no distinction between claims secured by a traditional or non-traditional mortgage such as a reverse mortgage. If a claim is secured by the debtor's principal residence, and a payment is listed under "Installment Payment" or "Arrearage Payment" or both, then the form plan provides that postpetition fees, expenses, and charges that are properly noticed in accordance with Rule 3002.1 are paid unless otherwise ordered by the court. Part 3.1 of the court's form plan was constructed such that payments being made to maintain the mortgage and to cure arrearages were equally considered to be contractual installment payments for the purpose of Rule 3002.1(a). If non-traditional mortgages were intended to be treated differently from traditional mortgages, the form plan could easily have said so.

Drafting Part 3.1 of the court's form plan was not done in isolation of the practice that existed before the form plan was adopted on December 1, 2017, but was consistent with that of the unofficial form plans utilized by Chapter 13 trustees in this district both prior to and after the adoption of Rule 3002.1 in 2011. In both eras, pre and post Rule 3002.1, no distinction was made between types of long-term mortgages securing claims, traditional or non-traditional, when it came to noticing postpetition fees, expenses, or charges incurred on a claim secured by the debtor's principal residence. The claim holder was always required to provide notice of fees, expenses, or charges to the court, the debtor, and the Chapter 13 trustee. For example, the Chapter 13 trustee's form plan used in this division prior to the adoption of Rule 3002.1 stated in paragraph 12A:

> Confirmation of the plan shall impose an affirmative duty on the holders and/or servicers of any claims secured by liens, mortgages and/or deeds of trust on the principal residence of the Debtors to do all of the following:
> ….
> (6) To file with the court and serve upon the Trustee, the Debtors, and the attorney for the Debtors, by February 15 of each year governed by this plan, an Annual Statement detailing … (v) all fees and charges alleged to have accrued post-petition, along with an explanation thereof….

*In re Scott*, No. 2:08-bk-51306-MPP (Order Confirming Plan entered September 25, 2008; docket #53). Likewise, the Chapter 13 trustee's form plan used in this division after the adoption of Rule

3002.1 (and prior to mandatory use of the court's form plan) stated in paragraph 12:

> **MORTGAGE CLAIMS:** Mortgage lien holders shall file claims per applicable Federal Rules of Bankruptcy Procedure (FRBP), including but without limitation, Rules 3001 and/or 3002.1…. Creditors filing mortgage claims secured by debtor(s) principal residence shall file: Mortgage Proof of Claim Attachment 410A (Attachment A); Notice of Mortgage Payment Changes on Form 4105-1 (Supplement 1); and Notice of Post-Petition Mortgage Fees, Expenses, and Charges ….

*In re Roberts*, No. 2:16-bk-51007-MPP (Order Confirming Plan entered August 26, 2016; docket #41). As shown by the language in the foregoing plans, in this district the holders of claims secured by a debtor's principal residence have long been required to provide notice of postpetition fees, expenses, and charges without distinction as to the type of mortgage.

Timely noticing of a postpetition fee, expense, or charge provides transparency to the mortgage claim being administered so that the debtor and the Chapter 13 trustee have an opportunity to determine whether adjustments need to be made to pay or challenge the amount so that the mortgage will not be in default on the plan's completion. Prior to the adoption of Rule 3002.1 various plan provisions had been implemented by courts to deal with postpetition fees, expenses, and charges for mortgages secured by a debtor's principal residence. Yet, problems remained.

> Bankruptcy Rule 3002.1 was adopted to resolve significant and often hidden problems encountered by Chapter 13 debtors who utilized § 1322(b)(5) of the Bankruptcy Code to cure mortgage defaults in their confirmed plans. While debtors could cure an arrearage on their principal residence under § 1322(b)(5), they often incurred significant fees and other costs as a result of postpetition defaults or from interest or escrow fluctuations under the terms of the original loan documents. Fearful that any attempt to address these fees and charges could be construed as a violation of the automatic stay, many creditors would not inform debtors that these charges had been incurred until after the Chapter 13 case was closed. As the fees and charges were postpetition obligations not included in the plan and thus not discharged at the conclusion of the case, these debtors would emerge from bankruptcy only to face a substantial and previously undisclosed arrearage. This outcome was inconsistent with the goal of providing debtors with a fresh start.

*In re Sheppard*, No. 10-33959-KRH, 2012 WL 1344112, at *2 (Bankr. E.D. Va. Apr. 18, 2012).

10

The Advisory Committee commented that Rule 3002.1 was "added to aid in the implementation of § 1322(b)(5), which permits a chapter 13 debtor to cure a default and maintain payments on a home mortgage over the course of the debtor's plan."   Advisory Committee Notes (2011 Adoption).   But despite the comment and broad scope of the rule's original title, "Notice Relating to Claims Secured by a Security Interest in the Debtor's Principal Residence in a Chapter 13 Case," some early decisions excluded the rule's application if there was no prepetition arrearage to be cured, *see In re Weigel*, 485 B.R. 327, 328 (Bankr. E.D. Va. 2012); or if the claim was being paid directly by a debtor instead of by the trustee, *see In re Merino*, No. 9:09-BK-22282-FMD, 2012 WL 2891112, at *1 (Bankr. M.D. Fla. July 16, 2012).   Such holdings are understandable because subsection (a) originally stated that Rule 3002.1 "applies in a chapter 13 case to claims that are (1) secured by a security interest in the debtor's principal residence, and (2) provided for under § 1322(b)(5) of the Code in the debtor's plan."   Subsection (a) was amended in 2016 to eliminate the narrow applications because the rule had never been intended to be limited in such fashions.

> Subdivision (a) is amended to clarify the applicability of the rule. Its provisions apply whenever a chapter 13 plan provides that contractual payments on the debtor's home mortgage will be maintained, whether they will be paid by the trustee or directly by the debtor.   The reference to § 1322(b)(5) of the Code is deleted to make clear that the rule applies even if there is no prepetition arrearage to be cured. So long as a creditor has a claim that is secured by a security interest in the debtor's principal residence and the plan provides that contractual payments on the claim will be maintained, the rule applies.

Advisory Committee Notes (2016 Amendment).

> The 2016 amendment changed subsection (a) of Rule 3002.1 to read as follows:

> This rule applies in a chapter 13 case to claims (1) that are secured by a security interest in the debtor's principal residence, and (2) for which the plan provides that either the trustee or the debtor will make contractual installment payments….

Fed. R. Bankr. P. 3002.1(a) (Dec. 2016 - Nov. 2024 version).   The drafting decision to use the more inclusive operative word "contractual" instead of "maintenance" to modify the word "payments" indicated that the rule was not intended to be limited to mortgages where only payments for principal and interest were being maintained.   Instead, any plan payments that were being made to fulfill the terms of a mortgage were to be encompassed

11

within the phrase "contractual installment payments."   The language in subsection (c) requiring the noticing of fees, expenses, and charges even for a nonrecourse mortgage such as a reverse mortgage lent support to the inclusive nature of the phrase "contractual installment payments."

> The holder of the claim shall file and serve on the debtor, debtor's counsel, and the trustee a notice itemizing all fees, expenses, or charges (1) that were incurred in connection with the claim after the bankruptcy case was filed, and (2) that the holder asserts are recoverable against the debtor or against the debtor's principal residence. (Emphasis supplied.)

Fed. R. Bankr. P. 3002.1(c) (2011 – Nov. 2024 version).   It was in this environment that the court adopted its form plan on December 1, 2017.   From that time until December 1, 2025, the language in subsections (a) and (c) of Rule 3002.1 remained the same except for a couple of stylistic changes made as a part of the general restyling of the Federal Rules of Bankruptcy Procedure effective December 1, 2024.

The court's construction of Part 3.1 of the form plan to include all types of long-term mortgages was recently borne out by an amendment to Rule 3002.1(a) adopted by the United States Supreme Court on April 23, 2025, that became effective December 1, 2025.   The amendment both clarifies and expands the rule's application.   The clarification pertains to reverse mortgages.   The expansion is made to bring under the rule home mortgages that are modified and paid according to the terms of the plan instead of the contract, such as those being bifurcated or otherwise paid off during the life of the plan.   As stated by the Advisory Committee:

> Subdivision (a), which describes the rule's applicability, is amended to delete the words "contractual" and "installment" in the phrase "contractual installment payments" in order to clarify and broaden the rule's applicability. The deletion of "contractual" is intended to make the rule applicable to home mortgages that may be modified and are being paid according to the terms of the plan rather than strictly according to the contract, including mortgages being paid in full during the term of the plan. The word "installment" is deleted to clarify the rule's applicability to reverse mortgages. They are not paid in installments, but a debtor may be curing a default on a reverse mortgage under the plan.   If so, the rule applies.

Advisory Committee Note (2025 Amendment) (emphasis supplied).   The 2025 change to Rule 3002.1(a) is illustrated as follows:

> This rule applies in a Chapter 13 case to a claim that is secured by a security interest

> in the debtor's principal residence and for which the plan provides for the trustee
> or debtor to make ~~contractual installment~~ payment <u>on the debt</u>…."

With respect to reverse mortgages, the clarification of Rule 3002.1(a) was consistent with decisions of *In re LeGare-Doctor* and *In re Reed* wherein the courts had refused to concede that Rule 3002.1 only applied if maintenance payments were being made. *See In re LeGare-Doctor*, 634 B.R. 453 (Bankr. D.S.C. 2021) (Rule 3002.1 applied to advances to reverse mortgage loan balance.); *In re Reed*, No. 17-52875-RBK, 2021 WL 4395821 (Bankr. W.D. Tex. Sept. 24, 2021) (concluding that "contractual installment payments" includes arrearage payments but ultimately finding Rule 3002.1 to be inapplicable because the statutory lien was not a security interest).

In *Reed* the debtor executed a loan to pay ad valorem taxes owed on his principal residence secured by a deed of trust that extended an existing tax lien. The Chapter 13 plan paid the creditor the principal balance over the life of the plan along with prepetition arrears. The creditor argued that Rule 3002.1 did not apply to its postpetition fees, expenses, and charges because the payments it had received under the plan were not "contractual installment payments." *In re Reed*, 2021 WL 4395821, at *1. The argument was that the terms of the plan governed in place of the terms of the contract because the loan was being paid off over the life of the plan. The *Reed* court rejected the argument, stating that "the term 'contractual installment payments' includes payments to [the creditor] under the plan for prepetition arrearages." *Id*.

In *LeGare-Doctor* the debtor had a reverse mortgage encumbering his principal residence. The court noted that the debtor "was not required to remit monthly payments to repay the loan secured by the Reverse Mortgage," but was "contractually required to pay annual property taxes and hazard insurance premiums for the Property during the term of the Reverse Mortgage." *In re LeGare-Doctor,* 634 B.R. at 454. Prior to the bankruptcy filing the creditor had advanced the payment of taxes, fees, and attorney's fees and costs associated with a foreclosure judgment. The debtor's plan "proposed to cure any default by paying Creditor, through the Trustee, monthly installment payments during the plan's sixty-month term to repay taxes, fees, and attorney's fees and costs." *Id.* at 455. A disagreement arose concerning the creditor's postpetition advance for hazard insurance. The debtor argued that the advance should be disallowed because the creditor never disclosed it within the 180-day period prescribed by Rule 3002.1(c). The creditor took the

13

position that the rule did not apply to the reverse mortgage because unlike a traditional mortgage there is no repayment through monthly installments, in other words there were no "contractual installment payments" being maintained. *Id.* at 457. The court concluded that Rule 3002.1 was applicable because "[b]y adding the advances to the loan balance, Creditor treated them as contractual payments that Debtor owed to it." *Id.* at 459. The monthly plan payments of the advances constituting the arrearage were "contractual installment payments" for the purpose of Rule 3002.1(a). That is precisely the situation in this case.

Mortgage Assets' brief does not address the *Reed* decision but does take issue with the decision in *LeGare-Doctor*, stating "that *LeGare-Doctor* is not binding, was incorrectly decided, and should not be adopted in this jurisdiction." However, Mortgage Assets fails to offer any contrary decision. The only decision other than *LeGare-Doctor* cited by Mortgage Assets is *In re White*, and it is offered for the proposition that contractual installment payments "refers to payments made pursuant to the original contract between the debtor and the secured creditor." *In re White,* 641 B.R. 717, 724 (Bankr. S.D. Ga. 2022). *White* is of no help to Mortgage Assets.

The Chapter 13 plan in *White* bifurcated the creditor's claim secured by the debtor's residence that was personal property. The secured portion of the claim was paid over the life of the plan, while the unsecured portion was paid a nominal dividend with other general unsecured creditors. *Id.* at 720. After the creditor filed a Rule 3002.1(c) notice listing fees incurred for filing the proof of claim and objecting to the plan, the debtor argued that Rule 3002.1 did not apply because the confirmed plan did not provide for contractual installment payments. *Id.* at 721. The court agreed, stating that when the rights of the creditor are modified in accordance with 11 U.S.C. §§ 1322(b)(2) and 506(a), the creditor "no longer enjoys the benefit of its original contract negotiated with the debtor" and the plan "becomes the modified contract between the debtor and creditors." *Id.* at 725 (citations omitted). As for the fees in the Rule 3002.1(c) notice, they would be discharged on completion of the plan. Of course, with the broadening of Rule 3002.1, such bifurcated claims have now been brought under the rule's purview.

The *White* decision offers no support for Mortgage Assets' stated position that "because the plan does not make contractual installment payments, then Rule 3002.1 does not apply."

14

*White* held that "following bifurcation, a debtor's plan payments to the affected secured creditor are not contractual installment payments for purposes of Bankruptcy Rule 3002.1 because the parties' original contract is no longer in force." *Id.* Instead of helping, the *White* decision counters the position advocated by Mortgage Assets because here the Reverse Mortgage is in full force and effect. When the *White* court stated that "the term installment payments refers to payments made pursuant to the original contract between the debtor and the secured creditor," it signaled readers to compare *LeGare-Doctor* because that decision offered an analogous proposition that indirectly strengthened the *White* court's holding. *Id.* at 724 n.8. In making the comparison the *White* decision implicitly rejects Mortgage Assets' argument that payments on the Arrearage are not "contractual installment payments."

While this court knows the *LeGare-Doctor* decision is not binding, the court does not agree it was incorrectly decided. As the court in *McGruder* observed, both the *White* and *LeGare-Doctor* decisions applied the appropriate "framework … [by] focusing on the respective plan's proposed treatment of the secured creditor's claim and whether said treatment was in accordance with the original contract …." *In re McGruder*, No. 20-20758, 2025 WL 991993, at *5 (Bankr. D. Kan. Apr. 1, 2025). The *McGruder* decision involved a fully matured mortgage that the debtor had modified under her plan to pay it off. The court said that in such an event "the secured creditor is said to have lost the 'benefit of its original contract negotiated with the debtor' as the confirmed plan, pursuant to § 1327(a), becomes the modified contract between the debtor and creditor, and the plan payments to the creditor are not contractual installment payments as the original contract is no longer adhered to." *Id.* at *4. As with bifurcated claims like the one in *White*, mortgage claims being modified under 11 U.S.C. § 1322(c)(2) as in *McGruder* have now been brought under the scope of Rule 3002.1.

Mortgage Assets' position would require the court to construe the phase "contractual installment payments" to mean "maintenance payments." The court will not do so. Instead, by focusing on whether the treatment of the claim here is in accordance with the original contract, this court aligns itself with the decisions in *LeGare-Doctor*, *White*, and *McGruder*. The court concludes that the plan's treatment of the claim based on the Reverse Mortgage was in accordance with the original contract. The Property Charges Balance of $3,710.03 and the Hazard Insurance

15

of $478.72 that the claim holder said were contractually due from the debtor under the terms of the Reverse Mortgage were paid off by monthly installments under the debtor's plan.   The obligation to repay the amount in arrears arose from the terms of the Reverse Mortgage and was fulfilled by the debtor making installment payments on the Arrearage under Part 3.1 of the plan. Therefore, the payments were contractual installment payments such that the claim holder was required to comply with Rule 3002.1(c).

### III.   Application of Arrearage Payments

An examination of the reports generated by PHH Mortgage Services reveals that the Arrearage payments from the Chapter 13 trustee were misapplied.   The following table presents the Principal and Corporate Advances from the Internal Payoff Statement and Loan Balance History as of December 7, 2021.    Principal Advances totaling $91,370.79 in Part A is the sum of $87,680.76 for Advances (Principal) and $3,710.03 for Property Charges Balance in Part B.   The Corporate Advances totaling $773.72 in Part A are itemized in Part B and consist of the Title Inspection of $265, Property Preservation Inspections of $80, and $428.72 for Hazard Insurance (calculated by crediting the Hazard Insurance Repay of $1,630.28 to the Corporate Advance for Hazard Insurance of $2,059).   Together, the Property Charges Balance and Corporate Advance for Hazard Insurance are the Arrearage of $4,138.75.

| A | | B | | |
|---|---|---|---|---|
| **INTERNAL PAYOFF STATEMENT** **AS OF DECEMBER 7, 2021** | | **LOAN BALANCE HISTORY** **AS OF DECEMBER 7, 2021** | | |
| **Principal Advances:** | **$ 91,370.79** | Property Charges Balance | 07/02/21 | $ 3,710.03 |
|  |  | Advances (Principal) | 07/02/21 | $ 87,680.76 |
| Interest: | $ 28,865.02 |  |  |  |
|  |  | **Principal Amount** |  | **$ 91,370.79** |
| MIP: | $ 7,249.50 |  |  |  |
|  |  | Prop Preserve – Inspect | 08/31/21 | $ 20.00 |
| Servicing Fees: | $ 6,090.00 | Title Inspection | 09/09/21 | $ 265.00 |
|  |  | Prop Preserve – Inspect | 09/28/21 | $ 20.00 |
| **Corporate Advances:** | **$ 773.72** | Hazard Insurance | 10/11/21 | $ 2,059.00 |
|  |  | Prop Preserve – Inspect | 10/19/21 | $ 20.00 |
| Intra Month Per Diem Total: | $ 43.29 | Prop Preserve – Inspect | 11/01/21 | $ 20.00 |
|  |  | Hazard Insurance Repay | 11/04/21 | ($ 1,630.28) |
| **Total Amount Due:** | **$ 134,392.32** |  |  |  |
|  |  | **Corporate Advance Amount:** |  | **$ 773.72** |

The second table presents the Internal Payoff Statement of December 7, 2021, alongside the Internal Payoff Statement of March 4, 2025.

| A INTERNAL PAYOFF STATEMENT AS OF DECEMBER 7, 2021 | | B INTERNAL PAYOFF STATEMENT AS OF MARCH 4, 2025 | |
|---|---|---|---|
| **Principal Advances:** | **$ 91,370.79** | **Principal Advances:** | **$ 91,370.79** |
| Interest: | $ 28,865.02 | Interest: | $ 52,038.41 |
| **MIP:** | **$ 7,249.50** | **MIP:** | **$ 5,856.76** |
| Servicing Fees: | $ 6,090.00 | Servicing Fees: | $ 7,455.00 |
| **Corporate Advances:** | **$ 773.72** | **Corporate Advances:** | **$ 12,567.04** |
| Intra Month Per Diem Total: | $ 43.29 | Intra Month Per Diem Total: | $ 443.75 |
| **Total Amount Due:** | **$ 134,392.32** | **Total Amount Due:** | **$ 169,776.75** |

The two sets of number comparisons are problematic.   First, the total amount of MIP (or Mortgage Insurance Premiums) decreased during the 40-month interval when it should have increased.[6] Second, Principal Advances of $91,370.79, which is the sum of Advances (Principal) of $87,680.76 and Property Charges Balance of $3,710.03 as shown in the first table, remained constant when it should have decreased.   The Property Charges Balance was paid off as a part of the Arrearage.   With the elimination of the Property Charges Balance, Principal Advances should

---

[6] For a Home Equity Conversion Mortgage, the borrower must pay an upfront mortgage insurance premium that presently is 1.75% of the home's appraised value and then annual premiums based on a fixed rate of the outstanding loan balance over the life of the loan which in this case is .5%. Annual premiums are paid in monthly installments that increase as the loan balance grows monthly from interest and possibly fees.   The lender remits the premiums to HUD that are used to fund the FHA insurance program that protects both the borrower and the lender. The insurance guarantees that the borrower or heirs will never owe more than the home's value when the loan is repaid.   The lender is protected if the loan balance exceeds the home's value at the time the loan is repaid.   The balance of MIP should never decrease over time.   *See* Libby Perl, *HUD's Reverse Mortgage Insurance Program: Home Equity Conversion Mortgages* (2017); U.S. Dep't of Hous. & Urban Dev. Mortgagee Letter 2023-05 at pp. 2-3 (2023).

have been reduced by $3,710.03.

The accounting in the Loan Balance History of March 4, 2025, for the categories of MIP and Principal Advances reveals the problems as shown in Table 3 in the appendix. PHH Mortgage Services misapplied the payments from the Chapter 13 trustee on the Property Charges Balance portion of the Arrearage against the MIP balance. The MIP should have increased by the postpetition monthly MIP payments totaling $2,317.29. Adding those payments to the MIP balance of $7,249.50 that existed on December 7, 2021, and excluding the $3,710.03 in misapplied payments, the balance for MIP is $9,566.79 as of March 4, 2025, not $5,856.76. When the payments of $3,710.03 on the Arrearage are applied to Property Charges Balance as they should have been, the Principal Advances balance is reduced from $91,370.79 to $87,680.76. The misapplied payments must be reversed and applied to eliminate the Property Charges Balance from Principal Advances.

IV.   The Postpetition Fees, Charges, and Expenses

Postpetition fees, expenses, and charges totaling $17,320.04 are itemized on the Loan Balance History for Corporate Advances of March 4, 2025, shown on Table 4 of the appendix. Postpetition credits itemized on the report of $898 for a property tax offset, $4,050 for a hazard insurance partial offset, and $150 in other reversals reduce the postpetition fees, expenses, and charges balance to $12,222.04. Of that sum, $8,569 is for force-placed insurance expenditures that the claim holder asserts is a postpetition default requiring cure.[7] The remaining balance of $3,653.04 in postpetition fees, expenses, and charges consists of $1,450 in Bankruptcy Attorney Fees, $1,016.04 in Other, $910 in Attorney Fees, $200 in Property Preservation Inspections, $65 for Title Exam Fee, and $12 in Recording Fees.

The noticing of fees, expenses, and charges required by Rule 3002.1(c) is not limited to only those that the claim holder contends are necessary to cure a default or maintain payments. "[A]ll fees, expenses, and charges incurred after the case was filed that the holder asserts are

---

[7] The total of $8,569 for the postpetition force-placed insurance arrearage is attributed to charges of $4,208 and $4,103 for coverage from October 2022 through October 2024 and $258 for partial coverage in November 2024.

recoverable against the debtor or the debtor's principal residence" must be noticed. Fed. R. Bankr. P. 3002.1(c). So, Mortgage Assets was not only required to notice the charges incurred for the force-placed insurance that it considers to be a default under the Reverse Mortgage, but also the $3,653.04 in non-insurance Corporate Advances added to the balance of the indebtedness secured by the debtor's residence. There is no dispute that the claim holder did not file a notice for any of the fees, expenses, or charges as required by Rule 3002.1(c).

Subsection (h) of Rule 3002.1 requires the court on motion by the debtor or trustee to "determine whether the debtor has cured the default and made all required postpetition payments."[8] Mortgage Assets states in its response to the debtor's Rule 3002.1(h) motion that the prepetition default was cured, but a postpetition default now exists due to force-placed insurance premiums of $8,569. The debtor and Chapter 13 trustee ask the court to find the Reverse Mortgage current because the claim holder did not notice the charges incurred for the postpetition force-placed insurance, and the Chapter 13 trustee also argued that the amount of the insurance expenditures was unreasonable. Mortgage Assets has the burden here.

> If, upon receipt of a Rule 3002.1(h) Motion, the mortgage creditor still believes that the debtor's mortgage loan has a postpetition arrearage, the mortgage creditor must appear at the hearing on the debtor's Rule 3002.1(h) motion and present evidence to establish its entitlement to the postpetition amounts claimed in its supplement. (Citations omitted.) If the mortgage creditor fails to appear at the hearing, or appears at the hearing but fails to submit evidence that establishes its entitlement to the postpetition amounts described in its supplement, the mortgage creditor has not met its burden of proof. In this event, the Court may find that the alleged postpetition arrearage did not exist, or find that the mortgage creditor has waived the opportunity to claim and collect these amounts. (Citations omitted.)

*In re Ferrell*, 580 B.R. 181, 185 (Bankr. D.S.C. 2017).

Once a postpetition fee, expense, or charge is justifiably challenged by a debtor or Chapter 13 trustee, the claim holder must establish that the fee, expense, or charge is valid and reasonable. To establish the validity of the fees, expenses, and charges a claim holder must establish a basis

---

[8] This is the version of Rule 3001.2(h) in effect at the time of the hearing. The 2025 amendment to Rule 3002.1 relocated subsection (h) to (g)(4)(A) and revised the text from "cured the default and made all required postpetition payments" to "cured all defaults and paid all required postpetition amounts on a claim described in (a)."

under contract or applicable nonbankruptcy law for their assertion.  *See, e.g., In re England*, 586 B.R. 795, 799 (Bankr. M.D. Ala. 2018) ("Upon a debtor filing a motion to determine mortgage fees, expenses, and charges pursuant to § 1322(e), the Court must look to the underlying agreement and applicable nonbankruptcy law to determine if the amounts are permissible.").   While the anti-modification provision of 11 U.S.C. § 1322(b)(2) for "a claim secured only by a security interest in real property that is the debtor's principal residence" preserves contract rights, "[i]t does not immunize mortgage lenders from allegations that they charged fees not authorized by the mortgage contract or non-bankruptcy law."  *In re Padilla*, 379 B.R. 643, 666 (Bankr. S.D. Tex. 2007). Under Tennessee law the operative contractual provisions will determine the validity of the force-placed insurance expenditures.  *See, e.g., In re Simoukdalay*, 557 B.R. 597, at 602-603 (Bankr. E.D. Tenn. 2016) (applying Tennessee law in construing terms of deed of trust concerning recovery of fees expended in pre-bankruptcy modification of the note, preparation of proofs of claim, and participation in the bankruptcy proceeding).

Mortgage Assets did not identify a specific contractual basis for the force-placed insurance expenditures other than generally under the terms of the Reverse Mortgage.  Of the documents comprising the Reverse Mortgage, the court has only the Note and Security Instrument to consider. The claim holder did not provide the Loan Agreement containing the terms under which the Reverse Mortgage was made.

The Note does not provide a basis for the force-placed insurance premiums.   The pertinent provisions of the Note are found in paragraph 7 that recites the "Lender may require immediate payment in full of all outstanding principal and interest if … (B) An obligation of the Borrower under the Security Instrument is not performed."  Part (C) then provides that "[i]f Lender has required immediate payment in full as described above, the debt enforced through sale of the Property may include costs and expenses, including reasonable and customary attorneys' fees, associated with enforcement of this Note to the extent not prohibited by applicable law…."   The debtor's attorney stated that the bankruptcy was filed to halt a noticed foreclosure.  But even if the declaration of foreclosure triggered the requirement of "immediate payment in full," the Note requires that "the debt be enforced through sale of the Property" before costs and fees are

20

permitted.   Because this contingency did not occur, the Note does not provide a contractual basis for any of the postpetition fees, expenses, or charges.

On the other hand, the Security Instrument requires the Borrower to insure the property against hazards and provides that the Lender may insure the property if the Borrower fails to do so.   The preface of the Security Instrument states that it secures not only "the repayment of the debt evidenced by the Note, with interest," but also "payment of all other sums, with interest, advanced under Paragraph 5 to protect the security of this Security Instrument…."   Paragraph 2 titled "Payment of Property Charges" states that "Borrower shall pay all property charges consisting of taxes … and hazard insurance premiums … in a timely manner …."   Paragraph 3 titled "Fire, Flood and Other Hazard Insurance" states that "Borrower shall insure all improvements on the Property … against any hazards, causalities, and contingencies, including fire…."   Finally, paragraph 5 provides in pertinent part:

> 5.   Charges to Borrower and Protection of Lender's Rights in the Property. Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in Paragraph 2….
>
> If Borrower fails to make these payments or the property charges required by Paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's interest in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2.[9] (Emphasis supplied.)

---

[9] Paragraph 5 goes on to state regarding MIP and Servicing Fees:
To protect Lender's security in the Property, Lender shall advance and charge to Borrower all amounts due to the Secretary for the Mortgage Insurance Premium as defined in the Loan Agreement as well as all sums due to the loan servicer for servicing activities as defined in the Loan Agreement.   Any amounts disbursed by Lender under the Paragraph shall become additional debt of Borrower as provided for in the Loan Agreement and shall be secured by this Security Instrument.

Unlike the postpetition discretionary charges incurred as Corporate Advances, the nondiscretionary monthly recurring MIP and Servicing Fee of $35 were not required to be noticed under Rule 3001.2(c).

21

The Security Instrument authorized the Lender to purchase force-placed insurance and assess the costs to the Borrower.   The debtor did not contest that she was contractually required but failed to maintain hazard insurance on her residence during the relevant time periods.   Accordingly, the validity of the force-placed insurance charges is established.   That leaves the question of reasonableness.

Relying on *In re Blakey*, the Chapter 13 trustee argued that—even if the charges assessed for force-placed insurance were valid—the amounts charged were not reasonable because PHH Mortgage Services over-insured the residence.   *See In re Blakey*, 664 B.R. 221, 222 (Bankr. W.D. Pa. 2024) (court held premium charged was unreasonable where force-placed coverage was more than four times fair market value of residence).   In support of this position, the Chapter 13 trustee stated that at the time of debtor's bankruptcy filing on December 7, 2021, the balance of the mortgage was less than $135,000 and the tax appraisal on property was $149,200.   The court cannot consider the tax appraised value for the residence because the parties did not stipulate it or otherwise submit it into evidence.   The court has only the debtor's verified value of $149,200 for the residence set forth in her schedule A/B as of the bankruptcy filing in 2021.

In considering the reasonableness of the force-placed insurance charges in *Blakey*, the court was presented with a force-placed policy with coverage in the amount of $895,000 with an annual premium of $9,437.   Because the loan balance was only around $87,000, the court found the charge to be unreasonable.   The creditor insisted that it was only passing along the undisputed actual cost of the policy that bore "a reasonable relationship to the servicer's cost of providing the service, and … [was] not otherwise prohibited by applicable law" as permitted by 12 C.F.R. § 1024.37(h).   Under that subsection, paragraph (1) requires that "all charges related to force-placed insurance assessed to a borrower by or through the servicer must be bona fide and reasonable," while paragraph (2) states that "[a] bona fide and reasonable charge is a charge for a service actually performed that bears."   12 C.F.R. § 1024.37(h)(1) and (2).   The court said that when it came to the "purchase of insurance coverage substantially exceeding" the value of the property, the creditor's "focus on [the] … out-of-pocket expense misses the point."   *In re Blakey*, 664 B.R. at 224-25.   Observing that "there is no evidence that an insurer would even pay out more than the replacement cost of the Property," the court stated that "if the Property is worth somewhere

22

between $135,000 and $200,000, then reasonable loss coverage should surpass that range only as a hedge against plausible appreciation. Any premium for coverage beyond that is unnecessary, wasteful, and likely devoid of any real benefit." *Id.* at 225. The court disallowed the expense and directed the creditor to file an amended notice seeking reimbursement of a reasonable insurance premium.

Here the amounts of coverage were $337,000 effective October 2022, $347,447 effective October 2023, and $355,091 effective October 2024 as shown in the attachments to Mortgage Assets' brief. Using an approximate loan balance of $170,000 as of March 2025 for comparison, the coverage for October 2024 through October 2025 is approximately twice the loan balance. The prior years of coverage would probably be in that same range of two times the approximate loan balances during those periods. In comparison to the value of the residence, the calculation is a little more difficult. If the property value was approximately $150,000 in December 2021, appreciation over time would move the value closer to the coverage amounts as home values in this area rose significantly during that 3-year time span.

Like the court in *Blakey*, this court recognizes that force-placed insurance coverage greater than the loan balance does little to benefit a borrower. As stated in paragraph 5 titled "Loss Settlement" in the "Conditions" section of the policies attached to Mortgage Assets' brief, in the event of a loss the insurance company "would pay only the least of the following: (1) the net loan balance at the time of the loss, (2) the cost to repair or replace, or (3) the policy limits." Although the claim holder bears the ultimate burden of proving that a charge is reasonable, the objecting party must do something more than just subjectively challenge the amount; the challenge needs some objective justification. No evidence was presented of a reasonable coverage amount or the approximate cost of such coverage during the relevant coverage periods. All the court has is the bare assertion that the PHH Mortgage Services over-insured the residence. Because the court has no proof that the market value of debtor's residence during the relevant coverage periods was significantly less than the coverage, the court cannot conclude the coverage amounts for the force-placed insurance were excessive. The court also notes that notwithstanding the levels of coverage force-placed on the residence, the debtor agreed to pay the full costs of the force-placed insurance

23

by extending her plan to resolve Mortgage Assets' motion for relief from the stay.   Thus, the court finds that the charges for force-placed insurance were reasonable.

Mortgage Assets makes one final argument implying that, even if it did not technically comply with Rule 3002.1(c), its failure should be excused because the debtor received actual notice of its purchase of force-placed insurance.   Mortgage Assets attached to its brief some documents offered for its position that "Ms. Manis was notified of the insurance requirement and force placed insurance during the pendency of the bankruptcy."   Those include:

(1) a document titled "Evidence of Insurance" from Standard Guaranty Insurance Company dated October 29, 2024, regarding the purchase of $4,308 for force-placed insurance coverage of $355,091 effective from October 28, 2024, through October 28, 2025;

(2) a letter from PHH Mortgage Services to debtor dated March 14, 2024, regarding the purchase of $4,208 for force-placed insurance coverage of $347,447 effective from October 28, 2023, through October 28, 2024, along with the declarations page and policy; and

(3) a letter from PHH Mortgage Services to debtor dated January 10, 2024, regarding the purchase of $4,103 for force-placed insurance coverage of $337,000 effective from October 28, 2022, through October 28, 2023, along with the declarations page and policy.

Apparently, Mortgage Assets considers that these documents should be accepted as proof that notice of the costs for the force-placed insurance was provided to the debtor, just not in conformity with Rule 3002.1(c).   However, rather than provide evidence of adequate notice to the debtor, the documents highlight Mortgage Assets' noncompliance with applicable nonbankruptcy law in servicing the Reverse Mortgage.

Section 1024.37 of the Real Estate Settlement Procedures Act (RESPA) governs force-placed insurance for federally related mortgage loans as is the case here.   *See* 12 C.F.R. § 1024.37. Subsection (a) states that "the term 'force-placed insurance' means hazard insurance obtained by a servicer on behalf of the owner or assignee of a mortgage loan that insures the property securing such loan."   Subsection (b) provides that "[a] servicer may not assess on a borrower a premium charge or fee related to force-placed insurance unless the servicer has a reasonable basis to believe that the borrower has failed to comply with the mortgage loan contract's requirement to maintain

24

hazard insurance."   As for when the servicer may assess the borrower for the force-placed insurance, subsections (c) and (d) state:

> (c) Requirements before charging borrower for force-placed insurance—
>
> > (1) In general. Before a servicer assesses on a borrower any premium charge or fee related to force-placed insurance, the servicer must:
> >
> > > (i) Deliver to a borrower or place in the mail a written notice containing the information required by paragraph (c)(2) of this section at least 45 days before a servicer assesses on a borrower such charge or fee;
> > >
> > > (ii) Deliver to the borrower or place in the mail a written notice in accordance with paragraph (d)(1) of this section; and
> > >
> > > (iii) By the end of the 15–day period beginning on the date the written notice  described in paragraph (c)(1)(ii) of this section was delivered to the borrower or placed in the mail, not have received, from the borrower or otherwise, evidence demonstrating that the borrower has had in place, continuously, hazard insurance coverage that complies with the loan contract's requirements to maintain hazard insurance.
> >
> > ….
>
> (d) Reminder notice—
>
> > (1) In general. The notice required by paragraph (c)(1)(ii) of this section shall be delivered to the borrower or placed in the mail at least 15 days before a servicer assesses on a borrower a premium charge or fee related to force-placed insurance. A servicer may not deliver to a borrower or place in the mail the notice required by paragraph (c)(1)(ii) of this section until at least 30 days after delivering to the borrower or placing in the mail the written notice required by paragraph (c)(1)(i) of this section.
> > ….

12 C.F.R. § 1024.37(c), (d), and (e).   RESPA applies to borrowers in bankruptcy.  *See In re Payne*, 387 B.R. 614, 634 (Bankr. D. Kan. 2008).

The written notice required under (c)(1)(i) has to include, among other things, statements that (1) hazard insurance is required on the borrower's property, (2) hazard insurance is expiring or has expired, (3) the servicer does not have evidence of hazard insurance coverage past the expiration date, (4) the servicer has purchased or will purchase such insurance at borrower's expense, (5) hazard insurance the servicer has or will purchase may cost significantly more and

not provide as much coverage as that purchased by the borrower, and (6) the borrower must provide hazard insurance information. *See* 12 C.F.R. § 1024.37(c)(2). If the servicer does not receive hazard insurance information or the information fails to demonstrate that the borrower has had sufficient hazard insurance in place continuously, (c)(1)(ii) requires the servicer to deliver to borrower or place in the mail a (d)(1) written reminder notice. The servicer may not send the (d)(1) reminder notice before 30 days have passed since the delivery or mailing of the (c)(1)(i) notice. Among other things the (d)(1) reminder notice must inform the borrower of "[t]he cost of the force-placed insurance, stated as an annual premium, except if a servicer does not know the cost of force-placed insurance, a reasonable estimate ...." 12 C.F.R. § 1024.37(d)(2). "Servicers may not impose charges for force-placed insurance without first completing [the] ... forty-five day process ...." *Marrett v. Aroostook Cnty. Fed. Sav. & Loan*, No. 1:24-CV-00300-JAW, 2024 WL 4344713, at *7 (D. Me. Sept. 30, 2024), *reconsideration denied,* No. 1:24-CV-00300-JAW, 2024 WL 6080493 (D. Me. Oct. 4, 2024), and *report and recommendation adopted,* No. 1:24-CV-00300-JAW, 2024 WL 4850209 (D. Me. Nov. 21, 2024) (citing 12 U.S.C. § 2605(l)(1) and the implementing regulation 12 C.F.R. § 1024.37(c)(1)(i)).

The documents offered by Mortgage Assets show that PHH Mortgage Services assessed the debtor a premium of $4,103 on January 4, 2024, six days before the date of the reminder notice informing debtor of the amount. Assessing the charge before the reminder notice dated January 10, 2024, was a violation of 12 C.F.R. § 1024.37(d)(1). Furthermore, over a year had passed before PHH Mortgage Services gave the debtor notice that it purchased a backdated policy for coverage effective beginning October 28, 2022. Providing notice to the debtor of the cost of force-placed insurance on January 10, 2024, only after the expiration of that postdated coverage, was in effect no notice at all. At that point, the debtor was left with no option but to accept the cost of the force-placed insurance because, unlike a servicer, a homeowner cannot purchase hazard insurance that is retroactive. PHH Mortgage Services also assessed the debtor the premium of $4,208 on March 7, 2024, seven days before the reminder notice informing debtor of the charge dated March 14, 2024. That cost was for coverage backdated to October 28, 2023, leaving the debtor with no option but to pay the cost for approximately five months of the force-placed

insurance.[10]   With respect to the force-placed insurance costing $4,308 for coverage effective beginning October 28, 2024, there was no written notice to the debtor of any sort included in the documents attached to Mortgage Assets' brief.   Moreover, Mortgage Assets provided no evidence that any notice concerning any of the three force-placed insurance coverages were in fact delivered or mailed to the debtor or that the debtor ever received one.   For these reasons, Mortgage Assets' argument that noncompliance with Fed. R. Bankr. P. 3002.1(c) should be excused because it otherwise provided the debtor notice of the force-placed insurance and costs during the bankruptcy is factually deficient and substantively unconvincing.

## V. The Relief

The debtor's bankruptcy filing was necessitated by a foreclosure scheduled because of her failure to maintain hazard insurance coverage on the residence as required under the terms of the Reverse Mortgage.   The debtor's plan was to become current on the Reverse Mortgage by curing the default consisting of the Property Charges Balance of $3,710.03 and the Hazard Insurance of $428.72.   Although no explanation was ever provided to the court as to the source of the Property Charges Balance or why PHH Mortgage Services chose to treat the Property Charges Balance as a Principal Advance instead of a Corporate Advance, the court is almost certain the Property Charges Balance was for force-placed insurance and possibly property taxes assessed by the prior servicer of the Reverse Mortgage.   This conclusion is based on the term "Property Charges Balance" being used interchangeably with "Prior Property Servicer Charges" by the servicer and paragraph 2 of the Security Instrument titled "Payment of Property Charges" concerning the

---

[10] The assessment of the charge before the expiration of the reminder notice's 15-day period may have been acceptable in the event of renewal or replacement of force-placed insurance as subsection (e) of § 1024.37 states:

> [I]f not prohibited by State or other applicable law, if a servicer has renewed or replaced existing force-placed insurance and receives evidence demonstrating that the borrower lacked insurance coverage for some period of time following the expiration of the existing force-placed insurance …, the servicer may, promptly upon receiving such evidence, assess on the borrower a premium charge or fee related to renewing or replacing existing force-placed insurance for that period of time.

12 C.F.R. § 1024.37(e)(1)(iii).   It appears the coverage of the second back-dated force-placed insurance policy came on the heels of the expiration of the first back-dated policy.

borrower's obligation to "pay all <u>property charges consisting of taxes … and insurance premiums</u> … in a timely manner." (Emphasis supplied.) Considering the debtor's history of failing to maintain hazard insurance on the residence, most likely the amount of $3,710.03 was a force-placed insurance charge imposed by the prior servicer.

Upon expiration of the policy effective beginning October 2021, the debtor failed to renew her insurance again, resulting in the two policies being force-placed effective October 2022 through October 2024 costing $8,311 that led to the filing of the motion for relief from stay. The court noted earlier that the amount Mortgage Assets asserted in its motion, $8,849.75, was incorrect. The amount in default at the time the motion was filed was $8,311, being the total of the charges for the two force-placed insurance policies of $4,103 and $4,208. Table 4 shows that at the time the motion was filed the unpaid balance of the Arrearage was $418.75. Adding $8,311 to the $418.75 Arrearage balance and a $120 erroneous charge (that was later reversed) equals the $8,849.75 amount Mortgage Assets stated was in default. Therefore, Mortgage Assets grounded its motion for relief from stay in part on accusations that the debtor was in default of the Reverse Mortgage by not paying the Arrearage and property taxes on the residence, neither of which were true.

Although the parties had resolved the motion for relief from stay with an agreement by the debtor to extend her plan to pay $8,311 over an additional 24 months, no order was forthcoming, and the motion was denied. Without casting blame the court observes that nothing prevented the debtor at that point from unilaterally filing a motion to modify her plan to implement what the agreement had contemplated. The court is more disturbed by what did not occur next. Notwithstanding the debtor having been alerted by the motion that the failure to maintain insurance was a postpetition default that would lead to foreclosure, and notwithstanding the claim holder having been alerted that both debtor's attorney and the Chapter 13 trustee insisted that Rule 3002.1(c) required the noticing of postpetition charges for force-placed insurance under the Reverse Mortgage, the episode was repeated. The debtor did not obtain hazard insurance after the expiration of the second force-placed insurance policy which resulted in the servicer force-placing a third policy in October 2024 for which it failed to file and serve the notice required by Rule 3002.1(c).

Considering the totality of these circumstances, the court must decide what if any relief should be granted under Rule 3002.1(i).[11]   The court has already determined the claim holder was required to file notices itemizing all the postpetition fees, expenses, and charges within 180 days after they were incurred.   The claim holder did not do so.   Although the debtor was made aware that the claim holder had incurred force-placed insurance expenditures when Mortgage Assets filed the motion for relief from stay on July 8, 2024, such notice was well outside the 180-day window of Rule 3001.2(c) as those expenditures were for the two one-year policies effective beginning October 28, 2022, and October 28, 2023, respectively.   Even earlier, the $3,653.04 in charges for Bankruptcy Attorney Fees, Other, Attorney Fees, Property Preservation Inspections, Title Exam, and Recording Fees were posted as Corporate Advances between December 10, 2021, and January 6, 2022.  The court was provided no evidence by the claim holder of if or when the debtor was made aware of any of those charges.   However, as the validity and reasonableness of those non-insurance charges incurred postpetition were not placed at issue by the parties in this contested matter, the court reaches no conclusion other than they were required to be noticed pursuant to Rule 3002.1(c).

Of all the postpetition fees, expenses, and charges incurred, the claim holder asserts that only those for force-placed insurance constitute a default under the Reverse Mortgage.   Because of those non-noticed insurance charges, the debtor now faces the harm of the Reverse Mortgage being foreclosed and loss of her home after entry of a discharge.   A foreclosure will deny the debtor the fresh start that the completion of her Chapter 13 plan was meant to provide.   The purpose of Rule 3002.1 is to prevent such an occurrence.

In the event a claim holder fails to timely provide the information required under subsection (c) of Rule 3002.1, subsection (i) of the rule provides:

[T]he court may, after notice and a hearing, take one or both of these actions:

(1) preclude the holder from presenting the omitted information in any form as evidence in a contested matter or adversary proceeding in the case—unless the failure was substantially justified or is harmless; and

---

[11] Subsection (i) was relocated to (h) in the amendment to Rule 3002.1 on December 1, 2025.

(2) award other appropriate relief, including reasonable expenses and attorney's fees caused by the failure.

Fed. R. Bankr. P. 3002.1(i).[12]   Accordingly, the court has determined it is appropriate to grant such relief to the debtor that will prevent the claim holder and its successors, transferees, and other assigns from ever using any postpetition fees, expenses, and charges incurred during this bankruptcy as a basis for declaring a default under the terms of the Reverse Mortgage.   Such relief serves the purpose of the rule and is both necessary and proper under Rule 3002.1(i)(2) considering the claim holder's actions and inactions during the debtor's bankruptcy case.   An order will be entered contemporaneously with the filing of this memorandum opinion prohibiting the claim holder and its successors, transferees, and other assigns from using the nonpayment of any of the postpetition fees, expenses, or charges incurred after the commencement of this bankruptcy up through entry of the debtor's discharge as a basis for declaring a default to foreclose the Reverse Mortgage.

**TABLE 1**

| Total Amount Due for Reinstatement as of 12/07/2021 | | |
| --- | --- | --- |
| *Corporate Advances* | | |
| **Date** | **Type** | **Amount** |
| 10/11/2021 | Corp Adv – S305 – Hazard Insurance | $ 2,059.00 |
| **Total** | | **$ 2,059.00** |
| *Remittances* | | |
| **Date** | **Type** | **Amount** |
| 11/04/2021 | Corp Adv – S305 – Hazard Insurance Repay | ($ 1,630.28) |
| **Total** | | **($ 1,630.28)** |
| *Transfer Charges* | | |
| **Date** | **Type** | **Amount** |
| 11/30/2021 | Prior Servicer Property Charges | $ 3,710.03 |
| **Total** | | **$ 3,710.03** |

---

[12] The amendment to Rule 3001.2 of December 1, 2025, added a third alternative under this subsection (now located at (h)) that a court may "take any other action authorized by this rule."

**TABLE 2**

| Total Amount Due for Reinstatement as of 05/05/2025 | | |
|---|---|---|
| *Corporate Advances* | | |
| **Date** | **Type** | **Amount** |
| 10/11/2021 | Corp Adv – S305 – Hazard Insurance | $ 2,059.00 |
| 12/13/2021 | Corp Adv – S305 – Taxes | $ 898.00 |
| 01/31/2022 | Corp Adv – S305 – Taxes Void | ($ 898.00) |
| 01/04/2024 | Corp Adv – S305 – Hazard Insurance | $ 4,103.00 |
| 03/07/2024 | Corp Adv – S305 – Hazard Insurance | $ 4,208.00 |
| 11/05/2024 | Corp Adv – S305 – Hazard Insurance | $ 4,308.00 |
| **Total** | | **$ 14,678.00** |
| *Remittances* | | |
| **Date** | **Type** | **Amount** |
| 11/04/2021 | Corp Adv – S305 – Hazard Insurance Repay | ($ 1,630.28) |
| 03/23/2022 | Part Repay – S305 – Transferred Prop Charges | ($ 210.51) |
| 04/05/2022 | Part Repay – S305 – Transferred Prop Charges | ($ 143.01) |
| 05/06/2022 | Part Repay – S305 – Transferred Prop Charges | ($ 125.38) |
| 06/07/2022 | Part Repay – S305 – Transferred Prop Charges | ($ 125.38) |
| 07/07/2022 | Part Repay – S305 – Transferred Prop Charges | ($ 125.38) |
| 08/05/2022 | Part Repay – S305 – Transferred Prop Charges | ($ 125.38) |
| 08/30/2022 | Part Repay – S305 – Transferred Prop Charges | ($ 125.38) |
| 10/06/2022 | Part Repay – S305 – Transferred Prop Charges | ($ 127.63) |
| 11/03/2022 | Part Repay – S305 – Transferred Prop Charges | ($ 127.63) |
| 12/08/2022 | Part Repay – S305 – Transferred Prop Charges | ($ 127.63) |
| 01/10/2023 | Part Repay – S305 – Transferred Prop Charges | ($ 127.63) |
| 02/03/2023 | Part Repay – S305 – Transferred Prop Charges | ($ 152.63) |
| 03/08/2023 | Part Repay – S305 – Transferred Prop Charges | ($ 158.68) |
| 04/05/2023 | Part Repay – S305 – Transferred Prop Charges | ($ 120.00) |
| 05/03/2023 | Part Repay – S305 – Transferred Prop Charges | ($ 120.00) |
| 06/06/2023 | Part Repay – S305 – Transferred Prop Charges | ($ 120.00) |
| 07/11/2023 | Part Repay – S305 – Transferred Prop Charges | ($ 120.00) |
| 07/21/2023 | Part Repay – S305 – Transferred Prop Charges | ($ 92.63) |
| 08/08/2023 | Part Repay – S305 – Transferred Prop Charges | ($ 147.37) |
| 09/11/2023 | Part Repay – S305 – Transferred Prop Charges | ($ 120.00) |
| 10/11/2023 | Part Repay – S305 – Transferred Prop Charges | ($ 120.00) |
| 11/08/2023 | Part Repay – S305 – Transferred Prop Charges | ($ 120.00) |
| 12/12/2023 | Part Repay – S305 – Transferred Prop Charges | ($ 120.00) |
| 01/12/2024 | Part Repay – S305 – Transferred Prop Charges | ($ 120.00) |
| 02/08/2024 | Part Repay – S305 – Transferred Prop Charges | ($ 120.00) |
| 03/08/2024 | Part Repay – S305 – Transferred Prop Charges | ($ 120.00) |
| 04/09/2024 | Part Repay – S305 – Transferred Prop Charges | ($ 120.00) |
| 05/10/2024 | Part Repay – S305 – Transferred Prop Charges | ($ 120.00) |
| 06/10/2024 | Part Repay – S305 – Transferred Prop Charges | ($ 110.03) |
| 06/10/2024 | Corp Adv – S305 – Hazard Insurance Repay | ($ 9.97) |
| 07/15/2024 | Corp Adv – S305 – Hazard Insurance Repay | ($ 120.00) |
| 07/17/2024 | Corp Adv – S305 – Hazard Insurance Repay Rev | $ 120.00 |

31

| 07/17/2024 | Corp Adv – S305 – Hazard Insurance Repay | ($ 120.00) |
| 08/14/2024 | Corp Adv – S305 – Hazard Insurance Repay | ($ 120.00) |
| 10/08/2024 | Corp Adv – S305 – Hazard Insurance Repay | ($ 178.75) |
| 11/26/2024 | Corp Adv – S305 – Hazard Insurance Repay | ($ 4,050.00) |
| **Total** | | **($ 9,819.03)** |

| | *Transfer Charges* | |
|---|---|---|
| **Date** | **Type** | **Amount** |
| 05/05/2025 | Prior Servicer Property Charges | $ 3,710.03 |
| **Total** | | **$ 3,710.03** |

**TABLE 3**

| LOAN BALANCE HISTORY FOR MIP<br>AS OF MARCH 4, 2025 | | |
|---|---|---|
| **Date** | **Transaction Description** | **MIP** |
| 12/07/2021 | Balance on Bankruptcy Filing | $ 7,249.50 |
| 12/31/2021 | Monthly MIP Accrual | $ 55.66 |
| 01/31/2022 | Monthly MIP Accrual | $ 55.75 |
| 02/28/2022 | Monthly MIP Accrual | $ 55.85 |
| 03/23/2022 | Part Repay — Transferred Property Charges | ($ 210.51) |
| 03/31/2022 | Monthly MIP Accrual | $ 55.92 |
| 04/05/2022 | Part Repay — Transferred Property Charges | ($ 143.01) |
| 04/30/2022 | Monthly MIP Accrual | $ 55.92 |
| 05/06/2022 | Part Repay — Transferred Property Charges | ($ 125.38) |
| 05/31/2022 | Monthly MIP Accrual | $ 56.01 |
| 06/07/2022 | Part Repay — Transferred Property Charges | ($125.38) |
| 06/30/2022 | Monthly MIP Accrual | $ 56.12 |
| 07/07/2022 | Part Repay — Transferred Property Charges | ($ 125.38) |
| 07/31/2022 | Monthly MIP Accrual | $ 56.25 |
| 08/05/2022 | Part Repay — Transferred Property Charges | ($ 125.38) |
| 08/30/2022 | Part Repay — Transferred Property Charges | ($ 125.38) |
| 08/31/2022 | Monthly MIP Accrual | $ 56.37 |
| 09/30/2022 | Monthly MIP Accrual | $ 56.53 |
| 10/06/2022 | Part Repay — Transferred Property Charges | ($ 125.38) |
| 10/31/2022 | Monthly MIP Accrual | $ 56.71 |
| 11/03/2022 | Part Repay — Transferred Property Charges | ($ 127.63) |
| 11/30/2022 | Monthly MIP Accrual | $ 56.91 |
| 12/08/2022 | Part Repay — Transferred Property Charges | ($ 127.63) |
| 12/31/2022 | Monthly MIP Accrual | $ 57.14 |
| 01/10/2023 | Part Repay — Transferred Property Charges | ($127.63) |
| 01/31/2023 | Monthly MIP Accrual | $ 57.40 |
| 02/03/2023 | Part Repay — Transferred Property Charges | ($ 152.63) |
| 02/28/2023 | Monthly MIP Accrual | $ 57.65 |
| 03/08/2023 | Part Repay — Transferred Property Charges | ($ 158.68) |
| 03/31/2023 | Monthly MIP Accrual | $ 57.90 |
| 04/05/2023 | Part Repay — Transferred Property Charges | ($ 120.00) |
| 04/30/2023 | Monthly MIP Accrual | $ 58.16 |

32

| | | |
|---|---|---|
| 05/03/2023 | Part Repay  —  Transferred Property Charges | ($ 120.00) |
| 05/31/2023 | Monthly MIP Accrual | $ 58.43 |
| 06/06/2023 | Part Repay  —  Transferred Property Charges | ($120.00) |
| 06/30/2023 | Monthly MIP Accrual | $58.70 |
| 07/11/2023 | Part Repay  —  Transferred Property Charges | ($ 120.00) |
| 07/21/2023 | Part Repay  —  Transferred Property Charges | ($ 92.63) |
| 07/31/2023 | Monthly MIP Accrual | $ 58.97 |
| 08/08/2023 | Part Repay  —  Transferred Property Charges | ($ 147.37) |
| 08/31/2023 | Monthly MIP Accrual | $ 59.22 |
| 09/11/2023 | Part Repay  —  Transferred Property Charges | ($ 120.00) |
| 09/30/2023 | Monthly MIP Accrual | $ 59.53 |
| 10/11/2023 | Part Repay  —  Transferred Property Charges | ($ 120.00) |
| 10/31/2023 | Monthly MIP Accrual | $59.83 |
| 11/08/2023 | Part Repay  —  Transferred Property Charges | ($ 120.00) |
| 11/30/2023 | Monthly MIP Accrual | $ 60.14 |
| 12/12/2023 | Part Repay  —  Transferred Property Charges | ($ 120.00) |
| 12/31/2023 | Monthly MIP Accrual | $ 60.46 |
| 01/12/2024 | Part Repay  —  Transferred Property Charges | ($ 120.00) |
| 01/31/2024 | Monthly MIP Accrual | $ 60.78 |
| 02/08/2024 | Part Repay  —  Transferred Property Charges | ($ 120.00) |
| 02/29/2024 | Monthly MIP Accrual | $ 61.09 |
| 03/08/2024 | Part Repay  —  Transferred Property Charges | ($ 120.00) |
| 03/31/2024 | Monthly MIP Accrual | $ 61.36 |
| 04/09/2024 | Part Repay  —  Transferred Property Charges | ($ 120.00) |
| 04/30/2024 | Monthly MIP Accrual | $61.65 |
| 05/10/2024 | Part Repay  —  Transferred Property Charges | ($ 120.00) |
| 05/31/2024 | Monthly MIP Accrual | $ 61.96 |
| 06/10/2024 | Part Repay  —  Transferred Property Charges | ($ 110.03) |
| 06/30/2024 | Monthly MIP Accrual | $ 62.27 |
| 07/31/2024 | Monthly MIP Accrual | $ 62.62 |
| 08/31/2024 | Monthly MIP Accrual | $ 62.98 |
| 09/30/2024 | Monthly MIP Accrual | $ 63.34 |
| 10/31/2024 | Monthly MIP Accrual | $ 63.70 |
| 11/30/2024 | Monthly MIP Accrual | $ 64.03 |
| 12/31/2024 | Monthly MIP Accrual | $ 64.33 |
| 01/31/2025 | Monthly MIP Accrual | $ 64.66 |
| 02/28/2025 | Monthly MIP Accrual | $ 64.99 |
| Monthly MIP Accrual Total: | | $ 2,317.29 |
| Part Repay  —  Transferred Property Charges Total: | | ($ 3,710.03 |
| **MIP:** | | **$ 5,856.76** |
| ***LOAN BALANCE HISTORY FOR PRINCIPAL AMOUNT*** ***AS OF MARCH 4, 2025*** | | |
| 07/02/2021 | Property Charges Balance | $ 3,710.03 |
| 07/02/2021 | Advances (Principal) | $ 87,680.76 |
| **Principal Amount:** | | **$ 91,370.79** |

33

**TABLE 4**

| LOAN BALANCE HISTORY FOR CORPORATE ADVANCE AMOUNT AS OF MARCH 4, 2025 | | |
|---|---|---|
| **Date** | **Transaction Description** | **Corporate Advance Amount** |
| 12/07/21 | Balance on Bankruptcy Filing | $ 773.72 |
| 12/10/21 | Prop Preserve – Inspect | $ 20.00 |
| 12/13/21 | Taxes | $ 898.00 |
| 12/13/21 | Title Exam Fee | $ 65.00 |
| 12/17/21 | Other | $ 1,011.29 |
| 12/17/21 | Other | $ 4.75 |
| 12/17/21 | Attorney Fees | $ 390.00 |
| 12/17/21 | Attorney Fees | $ 260.00 |
| 12/17/21 | Attorney Fees | $ 260.00 |
| 12/17/21 | Recording Fees | $ 12.00 |
| 12/29/21 | Prop Preserve – Inspect | $ 20.00 |
| 01/25/22 | Prop Preserve – Inspect | $ 20.00 |
| 01/25/22 | Bnk Attorney Fees | $ 200.00 |
| 01/31/22 | Bnk Attorney Fees | $ 550.00 |
| 01/31/22 | Taxes Void | ($ 898.00) |
| 02/23/22 | Prop Preserve – Inspect | $ 20.00 |
| 03/22/22 | Prop Preserve – Inspect | $ 20.00 |
| 04/13/22 | Bnk Attorney Fees | $ 700.00 |
| 05/13/22 | Prop Preserve – Inspect | $ 20.00 |
| 06/08/22 | Prop Preserve – Inspect | $ 20.00 |
| 06/27/22 | Prop Preserve – Inspect | $ 20.00 |
| 07/07/22 | Prop Preserve – Inspect | $ 20.00 |
| 01/06/22 | Prop Preserve – Inspect | $ 20.00 |
| 01/04/24 | Hazard Insurance | $ 4,103.00 |
| 03/07/24 | Hazard Insurance | $ 4,208.00 |
| 06/10/24 | Hazard Insurance Repay* | ($ 9.97) |
| 07/15/24 | Hazard Insurance Repay* | ($ 120.00) |
| 07/17/24 | Hazard Insurance Repay | $ 120.00 |
| 07/17/24 | Hazard Insurance Repay | ($ 120.00) |
| 08/14/24 | Hazard Insurance Repay* | ($ 120.00) |
| 10/08/24 | Hazard Insurance Repay* | ($ 178.75) |
| 11/05/24 | Hazard Insurance Repay | $ 4,308.00 |
| 11/26/24 | Hazard Insurance Repay | ($ 4,050.00) |
| 12/10/24 | Prop Preserve – Inspect | $ 30.00 |
| 12/11/24 | Re-class Disbursement | ($ 30.00) |
| Corporate Advances Balance on Bankruptcy Filing | | $ 773.72 |
| Postpetition Corporate Advances | | $ 17,320.04 |
| Postpetition Corporate Advances Credits | | ($ 5,098.00) |
| Postpetition Corporate Advances Credits from Trustee Payments | | ($ 428.72) |
| **Corporate Advance Amount with Postpetition Arrearage:** | | **$ 12,567.04** |
| **Corporate Advance Amount Excluding Postpetition Arrearage:** | | **$ 3,653.04** |

# # #

34